UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE
------------------------------------------------------------------------×
Brian Bowman,

                *Plaintiff,*                        **Case No.**

    *v.*

                                                   **COMPLAINT**

Barclays Bank of Delaware,

                *Defendant.*
------------------------------------------------------------------------×

        Plaintiff Brian Bowman, by his counsel, The Pennington Law Group, alleges for his Complaint against Defendant Barclays Bank of Delaware ("Barclays") as follows:

## PRELIMINARY STATEMENT

        1.        Brian Bowman worked for Barclays under contract as a Software Engineer. Barclays discriminated against Mr. Bowman because of his race and national origin (African American) by accusing Mr. Bowman—without proof—of destroying and interfering with computer software, publicly criticizing his work while overlooking the deficiencies of his nonblack co-workers' work, allowing his co-workers to work from home and denying him the same, and making discriminatory inquiries such as "Why are Black people criminals,"—an inquiry rooted in racial bias.  Barclays also retaliated against Mr. Bowman for reporting workplace misconduct by terminating his employment in violation of Title VII.

        2.        Mr. Bowman seeks damages and costs against Barclays for discriminating against him because of his race (African-American) by treating him less favorably than his non-American co-workers and terminating his employment, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.*, Section 1981 of the Civil Rights Act of 1866 (§ 1981), 42 U.S.C. § 1981, and the Delaware Discrimination in Employment Act

(DDEA), 19 Del. C. 1953 § 711.

3.  Mr. Bowman seeks damages and costs against Barclays for discriminating against him because of his national origin (American) by treating him less favorably than his non-American co-workers and terminating his employment, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* and the Delaware Discrimination in Employment Act (DDEA), 19 Del. C. 1953 § 711.

4.  Mr. Bowman seeks damages and costs from Barclays for retaliating against him for engaging in protective activity by terminating his employment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.*

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

5.  Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims arising under Title VII and § 1981.

6.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's DDEA claim, as this claim is so related to the claims within such original jurisdiction that they form part of the same case or controversy.

7.  All conditions precedent to maintaining this action have been fulfilled. The EEOC issued Plaintiff a right to sue letter dated January 28, 2019.

## TRIAL BY JURY

8.  Plaintiff respectfully requests a trial before a jury.

## PARTIES

9.  Plaintiff, at all times relevant hereto, was a resident of Mercer County in the State of New Jersey.

10. Upon information and belief, at all times relevant hereto, Defendant was and is a corporation organized under the laws of the State of Delaware with its principal place of business located at 100 South West Street in Wilmington, Delaware, 19801.

### STATEMENT OF FACTS

11. On November 1, 2016, through his employer, AETEA Information Technology, ("AETEA"), Mr. Bowman was retained under contract to work as a Software Engineer for Barclays at its Wilmington, Delaware location.

12. When Mr. Bowman began working at Barclays, there were three hundred and five software engineers.

13. Out of that group, Mr. Bowman was the only American software engineer.

14. Three hundred and one of Barclays's software engineers were from India, most of whom came from the same region in India.

15. Mr. Bowman's first few weeks on the job went really well, as he quickly completed all his assignments and produced exceptional work.

16. Mr. Bowman worked so efficiently that his supervisor, Fajad Abdul Rajack, requested a formal meeting with him to talk about his work.

17. In that meeting, Mr. Rajack told Mr. Bowman that he was "working too fast" and needed to "slow down," explaining that Barclays gave his team an allocated budget for a finite amount of assignments, and if Mr. Bowman and the other engineers complete their assignments in less time, then Barclays will give his team a smaller budget at the next distribution. For this reason, Mr. Rajack wanted Mr. Bowman and his team to work slower so that his team could get the maximum amount of money from Barclays.

18. Mr. Bowman was visibly shocked that Mr. Rajack wanted him to manufacture unnecessary delay in his work product and deceive Barclays into paying inflated rates.

19. Mr. Bowman, however, was reasonably afraid that Mr. Rajack would retaliate against him and/or terminate him if he did not concede to Mr. Rajack's position.

20. Not surprisingly, after that meeting, Mr. Rajack's campaign of harassment began.

21. As Mr. Bowman continued to produce exceptional work, Mr. Rajack harassed him by alleging—without proof—"deficiencies" in his work product.

22. For example, Mr. Rajack frequently emailed Mr. Bowman a list of problems concerning projects or assignments that he claimed Mr. Bowman was responsible for, and copied several employees, including Mr. Bowman's co-workers, members from other teams, employees from other departments, and upper management employees.

23. These "problems," however, concerned projects and assignments that Mr. Bowman did not work on and was not involved in.

24. Mr. Bowman felt humiliated by Mr. Rajack's actions of copying several employees to an email in which he was singled out for creating "problems," especially since Mr. Rajack did not publicly reprimand his Indian co-workers that way.

25. Frustrated and hurt, Mr. Bowman reported Mr. Rajack's conduct to AETEA and Barclays, but no corrective measures were taken.

26. Mr. Rajack also treated Mr. Bowman less favorably then his Indian co-workers.

27. For example, Mr. Rajack allowed his Indian co-workers, including employees and contractors, to work from home but denied Mr. Bowman the opportunity.

28.     Mr. Bowman was very disappointed that he could not work from home since he made it clear to Barclays when it offered him the engineering position, that he could not take the job unless he could work from home a few days out of the week.

29.     It was important to Mr. Bowman since he lived in New Jersey, approximately eighty miles away from work.

30.     Barclays reassured Mr. Bowman in an email that working from home would not be an issue and would accommodate him.

31.     Mr. Rajack was also put on notice and agreed that Mr. Bowman could work from home at least once a week.

32.     To Mr. Bowman's dismay, Mr. Rajack denied all of Mr. Bowman's requests to work from home when he joined Mr. Rajack's team.

33.     Nevertheless, Mr. Bowman continued to be a top performer.  At the same time, Mr. Rajack's treatment toward Mr. Bowman grew more hostile.

34.     For example, Mr. Rajack frequently fabricated deficiencies in Mr. Bowman's work and yelled at him about these purported deficiencies in front of co-workers.

35.     When Mr. Bowman asked Mr. Rajack how he could improve his work, Mr. Rajack's only advice was to "shut up."

36.     Mr. Rajack even pulled Mr. Bowman into a formal meeting to make the wholly unsupported statement that his "performance was down and was not doing good work anymore."

37.     Mr. Rajack's claim that Mr. Bowman's performance was down was palpably untrue, because later that same day, Mr. Bowman's team unanimously voted him as the highest performing software engineer on the team.

38.     Meanwhile, many of Mr. Bowman's Indian co-workers submitted subpar work

and others did not know how to do their job.

39. To get by, at the end of each business day, Mr. Bowman's Indian co-workers would outsource their assignments to software engineers in India, who were just starting their work day.

40. These submissions were done in violation of Security Exchange Commission laws, which prohibit outsourcing bank information to other countries.

41. In the morning, the engineers in India would send the completed assignments back to Mr. Bowman's co-workers and his co-workers would submit these completed assignments as their own work product.

42. Mr. Bowman's co-workers would then split the ill-gotten proceeds from the assignments with the software engineers in India.

43. Although Mr. Rajack knew that many of his workers did not know how to do their jobs and were outsourcing their work to engineers in India, he did not reprimand them or recommend them for termination.

44. Mr. Bowman, however, frequently received unwarranted threats of termination from Mr. Rajack.

45. For example, on several occasions, Mr. Rajack would yell at Mr. Bowman in front of his co-workers, saying "do things my way or I'll get you fired," and "shut up and listen to me, or you'll be fired," which were clear threats that Mr. Bowman would face further harassment and termination for reporting Mr. Rajack's discrimination and illegal proceeds.

46. Mr. Bowman would advise Mr. Rajack that he is not Mr. Rajack's slave and did not appreciate being threatened.

47. Despite Mr. Bowman's protestations, Mr. Rajack's treatment of Mr. Bowman

continued unabated.

48. For example, Mr. Rajack made discriminatory comments such as "Why are Black people criminals?" "What do Black people eat for breakfast?" "All Black people aren't bad…just the ones with no education," and "Why do Black people hang out in front of apartment buildings?"

49. Mr. Bowman told Mr. Rajack to refrain from making such queries as he felt discriminated against, but to no avail.

50. Mr. Bowman then complained to Project Managers, Fred Racape and Abhinov Sharma, and Katrina Beech, an upper management employee at Barclays, about Mr. Rajacks' discriminatory comments, but no corrective measures were taken with regards to Mr. Rajack.

51. Mr. Rajack also engaged in an email campaign of falsely accusing Mr. Bowman of destroying and interfering with computer software.

52. For example, in April 2017, Mr. Rajack emailed Mr. Bowman, falsely accusing him of inserting a bug into a software, and copied Mr. Bowman's co-workers to that email. Mr. Bowman replied, saying that he did not interfere with any software and to provide evidence that he was responsible for the bug.

53. Mr. Rajack, however, could not provide any evidence. Instead, Mr. Rajack became very upset and advised Mr. Bowman that he was not allowed to question him or respond to him by email again. If Mr. Bowman had a complaint or disagreed with Mr. Rajack, he was required to tell Mr. Rajack in person.

54. Notably, Mr. Bowman was the only person on the team required to respond to Mr. Rajack's emails in person.

55. Frustrated and unwilling to be subjected to any more false accusations, Mr.

Bowman emailed Ms. Beech and Brandon Mordis, another upper management employee at Barclays, to report Mr. Rajack's mistreatment.

56. Ms. Beech and Mr. Mordis texted Mr. Bowman, saying that they were aware of Mr. Rajack's treatment and to "hang in there. We'll find a solution."

57. In June 2018, Barclays transferred Mr. Bowman to a different team and assigned Mr. Mordis to be his supervisor.

58. Although Mr. Bowman reported to Mr. Mordis, the work environment did not improve.

59. Many of Mr. Bowman's co-workers refused to speak or work with him and avoided talking to him during meetings. Instead, Mr. Bowman's co-workers talked to each other in their native language, preventing Mr. Bowman from participating in their discussions.

60. In addition, an Indian co-worker told him that no one wanted to work with him because he was not Indian and had a disagreement with an Indian manager—Mr. Rajack.

61. Despite the ostracization, however, Mr. Bowman continued producing exemplary work.

62. Shortly after working with his new team, Mr. Bowman noticed that several of his Indian team members were using wrong and outdated technology despite newer technology being available.

63. When Mr. Bowman spoke to his co-workers about using the old technology, they said they were using it to lengthen their assignments, per the directive of Mr. Rajack, so they could request more money and stay in the country longer.

64. Mr. Bowman told them that he would not participate in their scam, and on August 3, 2018, reported their conduct to Barclays.

65. On August 7, 2018, just four days later, Elliot Kaplan, the Senior Account Executive from AETEA, called Mr. Bowman and told him that Barclays had terminated his employment.

66. When Mr. Bowman asked why Barclays fired him, Mr. Kaplan said that it had fired him because he had worked from home without authorization.

67. Barclays's reason for firing Mr. Bowman, however, is nothing more than a pretext.

68. Mr. Bowman *never* worked at home during his employment with Barclay.

69. In reality, Barclay fired Mr. Bowman in retaliation for reporting workplace misconduct and because of his race and national origin, in violation of Title VII, Section 1981, and the DDEA.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION Wrongful Termination in Violation of Title VII

70. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 69 with the same force as though separately alleged herein.

71. Title VII prohibits an employer from discriminating against an employee in terms, conditions, or privileges of employment on the basis of race and national origin.

72. Defendant discriminated against Plaintiff by terminating his employment based on his race and national origin (African-American).

73. As such, Defendant has violated Title VII.

74. As a direct and proximate consequence of Defendant's race and national origin discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and compensatory damages, all in amounts to be determined at trial.

75. Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## CAUSES OF ACTION
## SECOND CAUSE OF ACTION Retaliation in Violation of Title VII

76. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 75 with the same force as though separately alleged herein.

77. Title VII prohibits employers from retaliating against its employers for engaging in protected activity.

78. Defendant violated Title VII when it terminated Plaintiff for reporting workplace misconduct.

79. As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

## CAUSES OF ACTION
## THIRD CAUSE OF ACTION Wrongful termination in Violation of Section 1981

80. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 79 with the same force as though separately alleged herein.

81. Section 1981 prohibits discrimination in a contractual relationship, such as employment, on the basis of race.

82. Defendant violated § 1981 by terminating Plaintiff's employment based on his race.

83. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

84. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## CAUSES OF ACTION
## FOURTH CAUSE OF ACTION Wrongful Termination in Violation of the DDEA

85. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 84 with the same force as though separately alleged herein.

86. The DDEA prohibits an employer from discriminating against an employee in compensation or in terms, conditions, and privileges of employment on the basis of race.

87. Defendant violated the DDEA when it terminated Plaintiff's employment based on his race (African-American).

88. As a direct and proximate consequence of Defendant's race discrimination, Plaintiff has suffered, and continues to suffer, substantial damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

89. Defendant's discriminatory treatment of Plaintiff involved a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages to be determined at trial;


B.  For the second cause of action, damages to be determined at trial;

C.  For the third cause of action, damages to be determined at trial; D. For the fourth cause of action, damages to be determined at trial; and

E. For such other and further relief as the Court deems just and proper.

Dated: May 3, 2019

By:  */s/ Raeann Warner*
Raeann Warner, Esq. (#4931)
Jacobs & Crumplar, P.A.
750 Shipyard Drive, Suite 200
Wilmington, DE 19801
Tel.: (302) 656-5445
Fax: (302) 656-5875
Email: Raeann@jcdelaw.com

-and-

James A. Lewis, V
The Pennington Law Group
76 South Orange Ave, Suite 213
Orange, New Jersey, 07079
jlewis@theplglaw.com

*Attorneys for Plaintiff*